**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

In re:

78-80 ST MARKS PLACE LLC,

                          Debtor.

------------------------------------------------------------------- x

MARIANNE T. O'TOOLE, ESQ., solely in her
capacity as the Chapter 7 Trustee of the estate of
78-80 St. Marks Place, LLC,

                          Plaintiff,

        v.

LAWRENCE V. OTWAY, a/k/a LAWRENCE
LORCAN OTWAY, a/k/a LORCAN OTWAY,
EUGENIE OTWAY a/k/a EUGENIE GILMORE-
OTWAY a/k/a EUGENIE GILMORE, SCHEIB'S
PLACE, INC. D/B/A WILLIAM BARNACLE
TAVERN, EXHIBITION OF THE AMERICAN
GANGSTER, INC., THEATRE 80, LLC, and
JOHN DOE CORPORATIONS "1" THROUGH
"100," OTHER JOHN DOE ENTITIES "1"
THROUGH "100,"

                          Defendants.

------------------------------------------------------------------- x

**FOR PUBLICATION**

Chapter 7

Case No. 21-12139 (MG)

Adv. Proc. No. 22-01152 (MG)

**MEMORANDUM OPINION AND ORDER GRANTING THE TRUSTEE'S MOTION**
**FOR SUMMARY JUDGMENT AND MOTION TO DISMISS THE DEFENDANTS'**
**COUNTERCLAIMS**

*A P P E A R A N C E S:*

LAMONICA HERBST & MANISCALCO, LLP
*Attorney for Ch. 7 Trustee of 78-80 St. Marks Place, LLC*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
By:    Holly R. Holecek, Esq.

EUGENIE OTWAY, ESQ.
*Attorney for the Defendants*
78-80 St. Marks Place
New York, NY 10003

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are two motions by Plaintiff Marianne T. O'Toole, Esq., solely

in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 78-80 St. Marks Place, LLC

("Debtor"):

1. A Motion for Summary Judgment ("MSJ," ECF Doc. # 19-1) pursuant to Rule 56 of the
   Federal Rules of Civil Procedure ("Federal Rules"), as made applicable by Rule 7056 of
   the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), against defendants
   Lawrence V. Otway, a/k/a Lawrence Lorcan Otway, a/k/a Lorcan Otway ("Otway")
   Eugenie Otway a/k/a Eugenie Gilmore-Otway, a/k/a Eugenie Gilmore ("Eugenie
   Otway"), Scheib's Place, Inc. d/b/a William Barnacle Tavern ("Scheib's"), Exhibition Of
   The American Gangster, Inc. ("Museum"), Theatre 80, LLC ("Theatre 80") (each a
   "Defendant" and collectively "Defendants"), on the First Claim for Relief in the
   Complaint dated September 30 2022.  ("Complaint," ECF Doc. # 1.)

2. A Motion to Dismiss ("MTD," ECF Doc. # 17-1) the counterclaims (each a
   "Counterclaim" and, collectively, "Counterclaims") asserted by Defendants in the
   Amended Answer and Counterclaims ("Answer," ECF Doc. # 16) pursuant to Federal
   Rule 12(b)(6), as made applicable to this adversary proceeding ("Adversary Proceeding")
   pursuant to Bankruptcy Rule 7012(b).

The Defendants filed briefs in opposition to both the MSJ and MTD.  These were

incorrectly filed on the docket for the Debtor's main bankruptcy proceeding.  (*See In re 78-80 St.*

*Marks Place, LLC* (Case No. 21-12139), "MSJ Opposition," ECF Doc. # 106; "MTD

Opposition," ECF Doc. # 111.)[1]

---

[1]     Multiple dockets are cited throughout this memorandum.  Docket cites with no case name reference refer to filings in this Adversary Proceeding.  Docket cites to the Debtor's bankruptcy case, *In re 78-80 St. Marks Place, LLC* (Case No. 21-12139), will be styled as (*In re 78-80 St. Marks*, ECF Doc. # _.)  Docket cites to Defendant Otway's bankruptcy case, *In re Lawrence V. Otway a/k/a Lorcan Otway*, (Case No. 21-12140), will be styled as (*In re Otway*, ECF Doc. # _.)

For the reasons explained below, the Court **GRANTS** the Trustee's Motion for Summary Judgment and **GRANTS** the Trustee's Motion to Dismiss.

## I.    <u>BACKGROUND</u>

### A.  General Background

This adversary proceeding arises out of the bankruptcy case of the Debtor, 78-80 St. Marks Place, LLC. *See In re 78-80 St. Marks Place, LLC* (Case No. 21-12139). The Debtor filed a petition for chapter 11 relief on December 29, 2021 (the "Petition Date"). (*See In re 78-80 St. Marks*, "Petition," ECF Doc. # 1.) Otway is the sole member and owner of the Debtor and executed the voluntary petition commencing the Debtor's Chapter 11 case. (Answer ¶¶ 9–10.) Otway also commenced a bankruptcy case for himself individually in connection with the Debtor's main bankruptcy case. *See In re Lawrence V. Otway a/k/a Lorcan Otway*, (Case No. 21-12140).

### B.  The Property and Other Defendants

The Debtor owns the real property known as and located at 78-80 St. Marks Place, New York, New York 10003 ("Property"). (Answer ¶¶ 1, 26.) The Property is a mixed-use property that houses three residential units, meeting and storage space, and multiple businesses. (*Id.*)

The other Defendants besides Otway in this case are: (1) Otway's wife, Eugenie Otway, who resides at the Property with Otway (*id.* ¶ 12); and (2) several business entities that operate at the Property, all of which are wholly-owned and controlled by Otway. Those include Defendants Scheib's, the Museum, and Theatre 80. (*Id.* ¶¶ 15–20.) Defendants contend that this is the full extent of entities owned by Otway or operating at the Property. (*Id.* ¶ 21.)

3

### C.  History of the Property

The following facts are taken from the MSJ Opposition and Otway's Declaration in Opposition to the MSJ and are uncontroverted unless noted.  (*See In re 78-80 St. Marks*, "Otway MSJ Decl.," ECF Doc. # 106-2.)

Otway has lived at the Property since approximately 1965.  (Otway MSJ Decl. ¶ 4.) Otway's father owned the Property at least as early as 1970.  (MSJ Opposition, at 3.)  Ownership passed to Otway's mother when Otway's father died in 1994.  (*Id.*)  Otway's mother attempted to obtain a mortgage on the Property in 2019.  (*Id.*, at 4.)  During that process, she also attempted to transfer a portion of ownership in the Property to Otway.  (*Id.*)  Otway's brother challenged that transfer in New York state court.  (*Id.*)

Otway reports that his brother settled the New York state court action, and that "the contested property joined the rest of the property in the corporation 78-80 St. Marks Place, LLC."  (*Id.*)  It is unclear from the record whether Otway had already owned equity in the Debtor, 78-80 St. Marks Place, LLC, at the time that transfer occurred, or whether he acquired his equity afterwards.

### D.  The Debt and Default on the Property

Many of the issues here revolve around a Forbearance Agreement and Consent Order (defined below) that arose from the Debtor's default on a debt.  Background regarding the debt and default are provided below.[2]

---

[2]      The MTD and MSJ submissions largely assume familiarity about the debt and default, and do not provide a detailed background.  Thus, much of the following background is taken from the submissions on earlier motions in the Debtor's bankruptcy case.  (*See In re 78-80 St. Marks*, "DIP Motion," ECF Doc. # 14; "Cash Collateral Motion," ECF Doc. # 15.)

1.  <u>The Debt</u>

In his MSJ Opposition, Otway describes an effort to obtain a mortgage on the Property in

2019.  Presumably he is referring to a loan made by 80 St. Marks Place Funding LLC (the

"Original Creditor") to the Debtor on or about November 12, 2019, in the principal amount of

$6,100,000 ("2019 Loan").[3]  (Cash Collateral Motion ¶ 6.)  The maturity date of the 2019 Loan

was December 1, 2020.  (DIP Motion ¶ 27.)  The 2019 Loan is evidenced by a Promissory Note

given by the Debtor in favor of the Original Creditor ("Note," *In re 78-80 St. Marks*, ECF Doc. #

26-3).  (Cash Collateral Motion ¶ 14.)  The Note is secured by (i) a Mortgage and Security

Agreement, dated November 12, 2019, executed by the Debtor, as Mortgagor, to the Original

Creditor, as Mortgagee, encumbering (among other things) the Property ("Mortgage," *In re 78-

80 St. Marks*, ECF Doc. # 26-4), and (ii) an Assignment of Leases and Rents ("ALR," *In re 78-

80 St. Marks*, ECF Doc. # 26-5), dated November 12, 2019, from the Debtor, as Assignor, to the

Original Creditor, as Assignee.  (*Id.*)  The Original Creditor perfected its security interest in the

collateral granted under the Mortgage by recording the Mortgage with the New York City

Register and filing a UCC-1 financing statement.  ("Leibowitz Declaration," *In re 78-80 St.

Marks*, ECF Doc. # 26 ¶ 22.)  The ALR was also recorded with the New York City Register.  (*Id.*

¶ 23.)

On November 12, 2019, Otway personally guaranteed the Debtor's obligations under the

2019 Loan ("Guaranty," *In re 78-80 St. Marks*, ECF Doc. # 26-6), and executed a Pledge and

Security Agreement ("Pledge Agreement," *In re 78-80 St. Marks*, ECF Doc. # 26-7) in favor of

the Original Creditor.  (Leibowitz Declaration ¶ 25.)  Pursuant to the Pledge Agreement, Otway

pledged all rights, title and interests in, to and under 100% of the limited-liability company

---

[3]       It does not appear that a copy of the 2019 Loan was filed with the Court.

interests in the Debtor to the Original Creditor (the "Pledged Collateral").  (*Id.*)  The Original

Creditor perfected its security interest in the Pledged Collateral by taking possession of the

certificate of membership interests in the Debtor ("Certificated Interests") and filing UCC-1

financing statements.  (*Id.* ¶ 26.)

On or around December 1, 2020 (the maturity date of the 2019 Loan), the 2019 Loan,

Note, Mortgage, ALR, Guaranty, Pledge Agreement, Certificated Interests, all UCC financing

statements, and all other documents evidencing, securing or guarantying the 2019 Loan were

each assigned by the Original Creditor to the St. Mark's Mixed Use LLC (the "Prepetition

Lender" or "St. Mark's Mixed Use").  (*Id.* ¶¶ 27–30; *see also* "Allonge to Promissory Note,"

ECF Doc. # 26-3 at 12; "Mortgage Assignment," ECF Doc. # 26-8; "ALR Assignment," ECF

Doc. # 26-9; "Omnibus Assignment," ECF Doc. # 26-10.)[4]

### 2.  Debtor's Default Under the 2019 Loan

On December 7, 2020, the Prepetition Lender sent a letter to the Debtor and Otway

notifying them that (i) the 2019 Loan had matured and the indebtedness became immediately due

and payable under the Note and Mortgage, (ii) the Debtor failed to pay the entire indebtedness

within 5 days when it became due, constituting an Event of Default under both the Note and

Mortgage, (iii) and interest on the indebtedness began to accrue at the Default Rate (24% per

annum) from and after December 2, 2020.  (DIP Motion ¶ 28.)

---

[4]      The 2019 Loan, Note, Mortgage, ALR, Guaranty, Pledge Agreement, Allonge to Promissory Note,
Mortgage Assignment, ALR Assignment, Omnibus Assignment, Certificated Interest, all UCC financing statements,
and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the
Prepetition Lender are collectively referred to as the "Loan Documents".

6

### E.    The Forbearance Agreement

In January 2021, the Debtor and Prepetition Lender entered into the Forbearance Agreement whereby the Debtor acknowledged the obligations and the Prepetition Lender agreed to extend certain obligations under the Loan Documents in exchange for a release and other consideration.  (*Id.* ¶ 29.)  Additionally, under the Forbearance Agreement, the Debtor was required to pay the principal and accrued interest on the 2019 Loan in less than 4 months.  (*Id.* ¶ 30.)  If the Debtor failed to repay in less than 4 months, the Debtor was required to list the Property for sale at $11,000,000 with the price decreasing each month through July 15, 2021, to a final listing price of $8,500,000.  (*Id.*)  If the Property was not sold by August 15, 2021, the Prepetition Lender would have the right to foreclose without opposition.  (*Id.*)

The Trustee attached the Forbearance Agreement as Exhibit E to her Rule 7056-1 Statement of Facts.  ("Forbearance Agreement," Ex. E. to Trustee MSJ Fact Statement, ECF Doc. # 19-2.)  Relevant for present purposes, each of the Defendants here agreed to the following under the Forbearance Agreement:

- That Defendants' 2019 leases relating to the Property expired and/or terminated on their own terms.

- That Defendants' 2020 leases relating to the Property were forever terminated.

- That the oral sublease between Theatre 80 and Scheib's: (a) was void and of no force and effect; and (b) forever terminated and of no effect whatsoever.

- That there were no other leases for the Property other than the ones explicitly identified in the Forbearance Agreement.

(Forbearance Agreement, at 10–12, ¶ 8.6.)  In the agreement, the Defendants acknowledged that they "each derived direct and substantial benefits from th[e] Forbearance Agreement."  (*See id.*

7

at 13, ¶ 8.12.)  The Defendants also acknowledged that (a) they executed the Forbearance

Agreement freely and voluntarily after having consulted with their independent legal counsel and

after having all of the terms explained to each of them by their independent legal counsel; and

(b) they had a full and adequate opportunity to negotiate the terms contained in the Forbearance

Agreement.  (*See id.* at 24, ¶ 18.19.)

### F.  The State Court Action and Consent Order

The Property was not sold by August 15, 2021, and on September 3, 2021, the Prepetition

Lender forwarded a Notice of Disposition of Collateral under sections 9-611 and 9-612 of the

New York State Uniform Commercial Code stating that Otway's Certificated Interests (i.e., the

Pledged Collateral) would be sold at a public auction on November 18, 2021.  (DIP Motion ¶

31.)

On November 11, 2021, the Debtor, along with Otway and other related entities

(including Defendants) filed the complaint in New York state court ("State Court Action")

seeking a preliminary injunction to stop any foreclosure or sale under the UCC.  (*See id.* ¶ 32;

"State Court Complaint" Ex. F. to Trustee MSJ Fact Statement, ECF Doc. # 19-2.)  On

November 29, 2021, the State Court Action was voluntarily dismissed upon entry of a stipulated

consent order, by which the Prepetition Lender agreed to forbear exercising remedies through

December 30, 2021.  (DIP Motion ¶ 32; "Consent Order" Ex. G. to Trustee MSJ Fact Statement,

ECF Doc. # 19-2.)  The Consent Order also provided that the Debtor and Prepetition Lender (and

the other parties) agreed that as of November 30, 2021, the amount due and owing under the

Secured Claim was $7,980,855.65, plus additional legal fees and protected advances.  (Consent

Order, at 5.)  The Debtor and Prepetition Lender also agreed that "[i]nterest shall continue to

accrue at the default rate of 24% per annum provided in the Note from December 2, 2020 until

the date that the [Debtor and Otway] have indefeasibly paid and satisfied all of their

obligations . . . under the Loan Documents and this Stipulation." (*Id.* at 7.)

The Trustee attached the complaint from the State Court Action and Consent Order as

Exhibits F and G, respectively, to her Rule 7056-1 Statement of Facts.  Important for present

purposes, the Consent Order included the same provisions regarding the existence/validity of

leases for the Property that were included in the Forbearance Agreement.  (*See* Consent Order ¶

8.6.)

### G.  The Debtor and Otway File Bankruptcy

#### 1.  Filing & Trustee Control Over Case

On December 29, 2021, both Otway and the Debtor filed voluntary petitions for relief

under Chapter 11 of the Bankruptcy Code in this Court.  Otway signed the Debtor's petition as

the sole member of the 78-80 Debtor.  (*See* Petition.)  On May 17, 2022, the Court entered an

order directing the appointment of a Chapter 11 Trustee for the Debtor, and Marianne T.

O'Toole was appointed as the Trustee.  (*In re 78-80 St. Marks Place*, ECF Doc. ## 58, 61.)   On

June 17, 2022, the Trustee moved to convert the Debtor's case to one under Chapter 7 of the

Bankruptcy Code.  (*In re 78-80 St. Marks Place*, ECF Doc. # 64.)  The Court granted the

Trustee's motion on July 25, 2022, and converted the Debtor's case to a Chapter 7 case.  (*In re

78-80 St. Marks Place*, ECF Doc. # 71.)

#### 2.  Relevant Events During Pendency of Bankruptcy

While the Trustee's motion to convert was pending, the Defendants claim that the

Trustee's inaction with respect to certain business opportunities harmed the Defendants.

Defendants report that in May 2022, they were approached by a film production company ("Production Company")[5] that was interested in conducting a film shoot on the Property. (Answer ¶ 128.) Defendants claim to have reached an agreement with the Production Company on the "dates, terms and usage" of the Property. (*Id.* ¶ 130.) On June 28, 2022, at the Trustee's request, the Defendants sent the Trustee a draft of the agreement that would govern the potential film shoot at the Property. (*Id.* ¶¶ 131–32.) While the Defendants' allegations are vague on timing, the following appears to have occurred between June 28 and July 11, 2022:

- The Trustee informed the Defendants about concerns with the agreement, and communicated that Defendants were not authorized to execute it.
- The Defendants contacted the Trustee, purporting to resolve those concerns, but the Trustee communicated additional concerns to counsel for the Defendants.
- The Defendants again worked with the Production Company to resolve the additional concerns, and again contacted the Trustee purporting to have resolved the additional concerns.
- The Trustee did not respond by the time that the Production Company wanted assurances that filming could commence on July 12, 2022, so the Production Company contacted the Trustee.
- The Trustee eventually contacted the Defendants informing them that filming was still not authorized.
- On July 11, 2022, the Production Company advised the Defendants that it would be finding a different location to film.

(*Id.* ¶¶ 132–149.) Defendants claim that the Trustee was aware from the beginning that filming was to begin on July 12, and that the Trustee's delay and failure to authorize the filming caused them monetary and reputational harm.

---

[5] The Complaint suggests that the location manager that approached the Defendants and production company conducting the filming might be distinct entities/individuals, but any distinction is irrelevant here and they are both included within the definition of "Production Company."

### H. Lifting the Bankruptcy Stay and the Instant Adversary Proceeding

#### 1. Lifting the Stay

On August 25, 2022, the Trustee filed a motion in Otway's personal bankruptcy seeking

relief from the automatic stay against Otway, the Debtor, and Otway's companies to compel the

turnover of possession of property of the Debtor's estate—namely, the Property—to the Chapter

7 Trustee. (*In re Otway*, "Lift Stay Motion," ECF Doc. # 27.) The Trustee claimed that neither

Otway nor Otway's companies had leases or agreements for their occupancy of the Property and

continued to remain in possession of the Property without paying rent to the Debtor, lowering the

value and impeding the Trustee's ability to liquidate. (Lift Stay Motion ¶¶ 22–23.) On

September 30, 2022, the Court entered and Opinion and Order granting the Trustee's Lift Stay

Motion. (*In re Otway*, "Lift Stay Order & Opinion," ECF Doc. # 39.)

#### 2. The Current Adversary Proceeding and Pending Motions

With the stay lifted, the Trustee initiated this Adversary Proceeding, filing a complaint

against the Defendants on September 31, 2022. (*See* Complaint.) The Complaint contains two

claims for relief: (i) turnover of property of the estate under sections 541 and 542 of the

Bankruptcy Code; and (ii) unjust enrichment under New York state law. (*Id.* ¶¶ 66–96.)

The Defendants filed their Answer, asserting three counterclaims against the Trustee on

November 16, 2022. (*See* Answer ¶¶ 125–191.) The asserted counterclaims were for: (i)

"wrongful interference with 3rd party's business"; (ii) "tortious interference with prospective

economic advantage"; and (iii) "attempted illegal eviction." (*See id.*)

The Trustee filed the MTD seeking to dismiss all three of the counterclaims on December

7, 2022. On December 13, 2022, the Trustee filed the MSJ seeking summary judgment on her

turnover claim.  Thus, by filing the MTD and the MSJ, the Trustee sought dispositive rulings on all claims in this action except her unjust enrichment claim.

The Defendants filed briefs and declarations in opposition to both the MTD and MSJ, albeit on the docket in the Debtor's main bankruptcy case.  In their MTD Opposition brief, Defendants conceded that their first and second counterclaims were duplicative and combined them.  (*See* MTD Opposition, at 12–13.)  And on January 13, 2023, the Defendants withdrew their third counterclaim.  (*See* ECF Doc. # 22.)  In sum, the MTD now only addresses a single counterclaim.  A hearing was held on the MTD and MSJ on January 25, 2023.  Both the Trustee and the Otways appeared, and the Court heard oral argument on the motions from both sides.

Defendants' opposition to both the MSJ and MTD depends on the existence of certain leases.  The Defendants attached copies of certain written leases to their Statement of Facts in Opposition to the MSJ.  (*See* "Attached Leases," Ex. 1 to Defendants' Statement of Facts, ECF Doc. # 107-1.)  The attached leases purport to be: (1) a lease from the Debtor to Scheib's; and (2) a sublease from Scheib's to Theatre 80.  (*See id.*, at 1, 6.)  The term of both leases began on November 8, 2019.  Moreover, and as addressed in more detail below, Otway also claims that he had a lease for part of the Property since 1970, which existed in written form at one point, but was inadvertently discarded.  (Otway MSJ Decl. ¶¶ 4–5.)

## II.    LEGAL STANDARD

### A. Procedural

#### 1. Motion for Summary Judgment

The Trustee has moved for summary judgment on its turnover claim, pursuant to Federal Rule 56, which is applicable in this proceeding pursuant to Bankruptcy Rule 7056.  To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to

12

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A).

13

Where the facts are not in dispute and the issues contested in a summary judgment

motion are legal issues, the court may decide the legal issues and rule accordingly on the

summary judgment motion.  *See Official Comm. of Unsecured Creditors of Quebecor World*

*(USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201, 211

(Bankr. S.D.N.Y. 2011) (stating that because "the facts are not in dispute, . . . it is appropriate to

determine the legal issues under the summary judgment standard").

### 2.  Motion to Dismiss

The Trustee moves to dismiss the Defendants' counterclaim for three independent

reasons: (a) Defendants fail to state a claim under Federal Rule 12(b)(6); (b) the Trustee is

immune from suit for the alleged conduct; and (c) Defendants asserted the counterclaim against

the wrong party.

### a.  Fed. R. Civ. P. 12(b)(6)

Under Federal Rule 12(b)(6), "[a] motion to dismiss a counterclaim is evaluated under

the same standards as a motion to dismiss a complaint."  *Revonate Mfg., LLC v. Acer Am. Corp.*,

No. 12-civ-6017, 2013 WL 342922, at *2 (S.D.N.Y. Jan 18, 2013) (quoting *Netrix Leasing, LLC*

*v. K.S. Telecom, Inc.*, No. 00-CIV-3375, 2001 WL 228362, at *8 (S.D.N.Y. Mar. 7, 2001)).  To

survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules, made applicable here by

Bankruptcy Rule 7012, a complaint need only allege "enough facts to state a claim for relief that

is plausible on its face."  *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis removed)).  "Where a complaint

pleads facts that are merely consistent with a defendant's liability, it stops short of the line

between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (citation and

internal quotation marks omitted).  Plausibility "is not akin to a probability requirement," but

rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal quotation marks omitted).

Courts use a two-pronged approach when considering a motion to dismiss. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that the motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working principles'") (quoting *Iqbal*, 556 U.S. at 678–79); *McHale v. Citibank, N.A. (In re the 1031 Tax Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009). First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). Second, the court must determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). A complaint that pleads only facts that are "merely consistent with" a defendant's liability does not meet the plausibility requirement. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The pleadings must create the possibility of a right to relief

that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

On a motion to dismiss, in addition to the complaint, a court may consider written instruments, such as a contract, that are either attached to the complaint or incorporated by reference. *See, e.g.*, FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Official Comm. of Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 89 (Bankr. S.D.N.Y. 2001) ("In addition to the complaint itself, a court may consider, on a motion to dismiss, the contents of any documents attached to the complaint or incorporated by reference . . . .").

### b. Immunity

Public officials, judges, and court officials are absolutely immune from common law tort liability for actions within the scope of their official duties. *See Stump v. Sparkman*, 435 U.S. 349 (1978) (concluding that judge immune from defamation suit); *Barr v. Matteo*, 360 U.S. 564 (1959) (concluding that acting director of federal office of rent stabilization immune from defamation suit). Absolute immunity can constitute a basis for dismissal, as it bars a suit at the outset, *Gray v. Bell*, 712 F.2d 490, 496 (D.C. Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984), even excusing allegations that the official acted maliciously or without authority. *See Stump*, 435 U.S. at 355–56.

### c. Opposing Party Rule & Fed. R. Civ. P. 13

Federal Rule 13, made applicable by Bankruptcy Rule 7013, directs that counterclaims be asserted "against an opposing party." *See* FED. R. CIV. P. 13(a)(1), (b); FED. R. BANKR. P. 7013. "The generally prevailing, although not uniform, view is that the 'opposing party' requirement means that when a plaintiff has brought suit in one capacity, the defendant may not

16

counterclaim against him in another capacity." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 885–886 (2d Cir. 1981) (citations omitted). Counterclaims asserted against a party that is not the opposing party are subject to dismissal under Rule 13. *See id.*

### B. Substantive Claims

The MSJ and MTD are directed at two underlying claims, respectively: (1) the Trustee's claim for turnover pursuant to sections 541 and 542 of the Bankruptcy Code; and (2) the Defendants' counterclaim for tortious interference with business relations.

The substantive requirements for each of these claims are addressed in the discussion section for ease of reference.

### III.    DISCUSSION

### A. Motion for Summary Judgment

The Trustee seeks summary judgment on its claim for turnover pursuant to sections 541 and 542 of the Bankruptcy Code. The Defendants do not appear to contest that the Trustee has met the basic requirements for such a claim. As the Trustee points out, Defendants do not contest that the Debtor owns the Property, and as such, the Property is decidedly property of the estate. *See* 11 U.S.C. 541. In turn, the Property is then the proper subject of a turnover action by a trustee. *See* 11 U.S.C. § 542. Defendants also do not appear to contend that they are excepted from delivering property to a trustee as "custodians" rightfully in possession under section 101(11) of the Bankruptcy Code. *See* 11 U.S.C. §§ 101(a), 542(a).

Defendants' legal theory against summary judgment on the turnover claim is not a model of clarity. Instead of contesting the elements above, Defendants' arguments hinge on the allegation that they have respective rent-controlled leases for portions of the Property. It is not clear from the briefs why the Defendants believe that rent-controlled leasehold interests would

17

have overriding legal significance in the context of a section 542 turnover action.  The

Defendants have not identified any sections of the Code or applicable non-bankruptcy law that

would alter a trustee's ability to bring a turnover claim under sections 541 and 542.  In any event,

the Defendants' place most of their emphasis on an alleged lease to Otway himself, background

for which is summarized as follows:

- Otway has had a lease at 80 St. Marks Place since 1970.  The lease was with two lessors: (1) Otway's father, and then (2) with Otway's mother, after Otway's father died in 1994.  It was a written lease that was likely discarded by an unrelated tenant. The lease was rent controlled.
- Otway's mother attempted to give a portion of the building to Otway; Otway's brother brought suit to challenge the transfer in 2019.
- Otway's brother settled the suit in November 2019, and "the contested property joined the rest of the property in the corporation 78-80 St. Marks Place, LLC."
- According to Defendants, "78-80 St. Marks Place LLC as landlord did not have the authority to remove rent control protections . . . .  Ordering the landlord to raise the rent without informing Mr. Otway of his rights as a rent-controlled tenant negates any authority as to the effectiveness of the document.  Mr. Otway as member of the corporation and as landlord inadvertently denied and withheld rights from Mr. Otway, the tenant.  Starting with the 2019 lease the raise in the amount of rent violated rent control regulation.  There would be no right it [*sic*] remove Mr. Otway's tenancy as happened in 2020."

(MSJ Opposition, at 3–4.)  The Opposition also alludes to the Prepetition Lender, St. Marks

Mixed Use, "changing" leases, but it is unclear how Defendants allege that happened.  (*Id.*)  The

Defendants also include leases to Scheib's and Theatre 80 in the Attached Leases, but they do

not explain the significance of those leases in their argument as they do for Otway's personal

lease.

    In response, the Trustee argues that: (1) Defendants should be judicially estopped from

asserting the existence of leases (whether rent-controlled or not); and (2) there is no genuine

dispute of material fact with respect to the existence of rent-controlled leases.  Each are

addressed in turn below.

1.  Judicial Estoppel

The first issue is whether Defendants should be judicially estopped from asserting the

existence of any leases for the Property.

"The doctrine of judicial estoppel prevents a party from asserting a factual position in one

legal proceeding that is contrary to a position that it successfully advanced in another

proceeding." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

The Second Circuit has explained that to invoke judicial estoppel, a movant must show: "(1) a

party's later position is clearly inconsistent with its earlier position, and (2) the party's former

position has been adopted in some way by the court in an earlier proceeding." *Ashmore v. CGI

Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019) (citing *New Hampshire v. Maine*, 532 U.S. 742,

750–51 (2001)).  If these two prerequisites are satisfied, then "a court must inquire into whether

the particular factual circumstances of a case 'tip the balance of equities in favor' of doing so."

*Clark v. AII Acquisition, LLC*, 886 F.3d 261, 266–67 (2d Cir. 2018) (citing *New Hampshire v.

Maine*, 532 U.S. at 751).  The "inquiry begins by asking whether the prior inconsistent position

in question gave the party to be estopped an 'unfair advantage' over the party seeking estoppel."

*Id.* at 267 (citations omitted).  Relief should be granted "when the risk of inconsistent results

with its impact on judicial integrity is certain." *Adelphia Recovery Tr. v. Goldman Sachs & Co.*,

748 F.3d 110, 116 (2d Cir. 2014) (citations omitted).

a.  Inconsistency

The Trustee's theory is simple.  In this proceeding, the Defendants claim that there are

multiple leases in existence, and that those leases are rent-controlled.  The Trustee claims that

this is entirely inconsistent with the representations Defendants agreed to in the Forbearance

Agreement and the Consent Order.[6]  Furthermore, the Trustee observes that the Debtor did not

list the leases in its schedules in this case.  (*See* "Debtor's Schedule G" Ex. D. to Trustee MSJ

Fact Statement, ECF Doc. # 19-2.)

Defendants do not appear to contest that the existence of the rent-controlled leases is

contrary to the representations they made in the Consent Order.  To be clear, the leases

Defendants point to may not have been explicitly included in the Consent Order.  The Consent

Order makes no mention of lease to Otway dating back to 1970, and the two written leases

commencing in 2019 that Defendants attach in support have different dates than the 2019 leases

listed in the Consent Order.  *Compare* Attached Leases *with* Consent Order § 8.6.  Nevertheless,

the Consent Order states that "[t]here are no leases or licenses to use any part of the [Property]

other than the following leases . . ."  (Consent Order § 8.6(a).)  Thus, the Court considers that

Defendants' assertion of previously undisclosed leases outside those explicitly listed in the

Consent Order is still inconsistent with that Consent Order.

### b.  Adopted

Defendants oppose the applicability of the second prerequisite for estoppel under

*Ashmore*—that its "former position has been adopted in some way by the court in an earlier

proceeding."  923 F.3d at 272.  To that end, Defendants argue that they did not enjoy any success

from the prior position that they asserted, and that the position was not adopted by this Court,

showing that estoppel is inappropriate.

With respect to the "success" aspect of their argument, the Defendants are wrong.  In

*New Hampshire v. Maine*, 532 U.S. at 751, on which *Ashmore* relied, the Supreme Court clearly

---

[6]      *See* Forbearance Agreement § 8.6(a); Consent Order § 8.6(a).  The Consent Order repeats the same
substantive provisions as the Forbearance Agreement regarding the existence and validity of leases.  The remainder
of the analysis will simply refer to the Consent Order as the prior source of an inconsistent position for purposes of
the estoppel analysis.

found that taking a position for purposes of entering into a consent decree was enough to show

that a position had been adopted prior.  Additionally, the Defendants here seem to suggest that

the prior position must be in the same exact litigation, which is also clearly wrong under certain

of the Defendants' own authorities.  *See, e.g.*, *Mitchell v. Washingtonville Central Sch. Dist.*, 190

F.3d 1, 6 (2d Cir. 1999) ("The prior inconsistent assertion need not be made to a court of law:

statements to administrative agencies, such as to the Social Security Administration in applying

for disability benefits, may also give rise to judicial estoppel.").

### c.  *Equities, Unfair Advantage & Judicial Integrity*

With two of the prerequisites met for estoppel, the Defendants argue that the remaining

factor (or factors, however they are characterized) still weigh against estoppel.  Defendants argue

that this is because their prior position was based on inadvertence or mistake.  *See New*

*Hampshire v. Maine*, 532 U.S. 742, 753 (2001).  The inadvertence or mistake, according to

Defendants, is that they now understand the leases they proffer were rent-controlled, which they

did not understand at the time the Forbearance Agreement and Consent Order were entered into.

Defendants are correct that "it may be appropriate to resist application of judicial

estoppel 'when a party's prior position was based on inadvertence or mistake.'"  *Id.* (quoting

*John S. Clark Co. v. Faggert & Frieden, P. C.*, 65 F.3d 26, 29 (4th Cir. 1995)).  But much like

the Supreme Court in *New Hampshire v. Maine*, this Court is "unpersuaded, however, that

[Defendants'] position . . . fairly may be regarded as a product of inadvertence or mistake."  *Id.*

For one, the underlying information here—leases to various Defendants—was not

unknown or inadvertently overlooked when the Forbearance Agreement or Consent Order were

entered into.  And neither were the facts that Defendants offer in attempting to show that the

tenancies were rent-controlled, including the age of the building and tenants' claimed

consistency in making rent payments on time.  Rather, Defendants claim that the inadvertence or

mistake was the failure to recognize that the leases were subject to rent control laws.  But this is

not so much a mistake as it is an attempt to make a new legal argument that the Defendants

failed to recognize before on the same facts.  And while that legal argument itself is not

necessarily contrary to any positions taken by Defendants in the past, it is wholly dependent on

making factual assertions that are completely contrary to those asserted in the Consent Order,

i.e., that there are no valid leases for the Property.  The Trustee also points out facts showing that

this likely was not a "mistake" in any event, as Defendants were represented by counsel in

entering into the Forbearance Agreement and Consent Order, are (or were) attorneys themselves,

and represented in the Forbearance Agreement that they received adequate consideration for their

consent.  (MSJ Reply, at 6–7.)

Moreover, the Defendants' arguments regarding their own inadvertent mistakes do not

even begin to address whether they are gaining an unfair advantage or prejudicing another party.

Even if the Court were to assume that overlooking rent-controlled leases was somehow an

excusable mistake, the next logical question to ask in determining whether they are seeking an

unfair advantage: what do Defendants expect to accomplish by establishing that inconsistent fact

(or legal position) here?

Defendants' argument requires closer inspection before its effects can be understood.

First, Defendants begin with the assertion that rent-controlled status of a lease provides a

safeguard against termination by a landlord.  While the parties have not briefed the exact

protections of rent control in New York City, the Court assumes that this general proposition is

valid.  Where Defendants go wrong, however, is in arguing that the Forbearance Agreement and

Consent Order were achieved by the wrongful termination of rent-controlled leases of the

tenants—including Otway and his related entities—by Otway himself *as the landlord*.  On its

face, this argument borders on nonsensical, and Defendants cite to no statutes or caselaw

showing how rent control would apply in this scenario.

      Furthermore, this argument completely overlooks that Otway was also acting on behalf of

the tenants—himself and related entities—in voluntarily relinquishing any rights under their

alleged lease(s).  Defendants make no argument that tenants cannot voluntarily relinquish the

benefits of a rent-controlled lease.  And again, while the parties have not briefed the law on rent

control, the Court would find it strange indeed if a tenant did not have the ability to voluntarily

walk away from a rent-controlled lease, should they choose to do so.  And that appears to be

what Defendants did here, in exchange for fair consideration,[7] advised by counsel, and fully

aware of the facts that they now claim retroactively confer rent-controlled status on the leases.

      Thus, as an initial matter, Defendants' arguments that the rent-controlled leases were

violated by the execution Forbearance Agreement and Consent Order do not have any legal

basis.  Moreover, when shifting back to the estoppel inquiry, the goal of Defendants' argument

here is to completely unravel the enforceability of the Consent Order by claiming that there was

no authority or validity for the provisions terminating and voiding any leases for the Property.

      Whether couched in terms of unfair advantage, the equities, or judicial integrity, this

drastic result of Defendants' argument dooms the remainder of the estoppel inquiry.  Here, the

Defendants clearly seek to prejudice the original counterparty to the Consent Order, St. Mark's

---

[7]      At the hearing on the MSJ, the Defendants attempted to argue that there was actually no consideration for the Forbearance Agreement because pursuant to the agreement, the Prepetition Lender only agreed to forbear from actions that were already prohibited under New York's eviction and foreclosure moratorium, which was in effect during the forbearance period.  The Trustee replied that the moratorium did apply to UCC Sales, which is what the Prepetition Lender originally sought and agreed to forbear from.  Moreover, Defendants' argument would not appear to apply to the Consent Order.  Thus, the Court rejects the arguments that the Forbearance Agreement or Consent Order are unenforceable for lack of consideration.

Mixed Use, the Prepetition Lender.  The purpose of the Consent Order was to resolve litigation in which Defendants attempted to prevent Prepetition Lender from selling the Property and recovering on its secured claims.  In exchange for a short period of breathing room, the Defendants disclaimed the existence and validity of any leases at the Property.  But now that the Trustee seeks to gain possession of the Property as the initial first step in liquidating the asset, the Defendants claim that previously undisclosed leases exist to hinder that process.  In seeking to delay liquidation, the Defendants seek to delay the Prepetition Lender's recovery on its claims, causing the Prepetition Lender prejudice.

Defendants plainly seek an unfair advantage here and cannot seriously argue that the equities tip in their favor.  Indeed, refusing estoppel here would provide Defendants "an opportunity to 'play [ ] fast and loose' with the requirements of the bankruptcy process and inject an unacceptable level of uncertainty into its results—exactly the result that the doctrine of judicial estoppel is intended to avoid."  *Adelphia Recovery Tr.*, 748 F.3d at 116.

In sum, the Court finds that the Defendants are estopped from asserting the existence and validity of leases for portions of the Property.

## 2.  Genuine Dispute of Material Fact

The Trustee argues that even if the Defendants are not estopped from asserting the existence of rent-controlled leases as a legal matter, that the Defendants have failed to raise a genuine factual dispute as to the leases' existence.  Indeed, the Trustee claims that she has indisputably shown that there were not any rent-controlled leases, and thus summary judgment is warranted on the turnover claim.  The Trustee is correct.

There are two categories of leases addressed in the Opposition to consider: (a) certain

leases to Scheib's and Theatre 80 attached to the Opposition; and (b) an alleged lease to Otway

himself that has not been included in any submission.

### a.   Leases Attached to Opposition

Defendants attach two leases to their MTD Opposition—the Scheib's Lease and 80

Theatre Sublease.  (*See* Attached Leases.)  The Trustee argues that there is no evidentiary dispute

that these leases lack rent control protections.  First, the Trustee argues that neither of the leases

indicates it is subject to rent control or rent stabilization, and neither has a rent stabilized lease

rider.  (*See generally id.*)  Second, the Trustee notes that Debtor's former counsel indicated that

"there is no documentation anywhere stating that this is a rent controlled property."  (*See* "Supp.

O'Toole Decl.," Ex. B at 1, ECF Doc. # 24.)  Further, as evidenced in the response received from

the New York State Homes and Community Renewal ("HCR") to a FOIL request for any rent

control and rent stabilization records for the Property, there is no registration card or MBR file

for the Property on file with HCR.  (*See* Supp. O'Toole Decl., Ex. D.)  Finally, the Trustee

argues that this is all supported by commonsense, given that ownership of the Property has been

under the Otway family's control for decades, who would have had no incentive to make any

Property leases rent-controlled.  This is also supported by the fact that the expired leases to non-

Otway controlled entities did not contain rent-control provisions either.  (*See* Reply in Sup. of

MSJ, at 8 n. 3; *See* Supp. O'Toole Decl., Ex. C.)

Otway's evidentiary arguments in response appear to consist of two points: (1) the

building was built in approximately 1830, and rent control applies to buildings built before 1947;

and (2) rent was consistently paid pursuant to the leases.  (MSJ Opposition, at 3–4.)  There are

three problems here.  First, it is unclear that this is a disputed factual argument, as opposed to a

legal argument to retroactively establish rent control status. Second and relatedly, it is also

unclear that meeting these two requirements alone would be sufficient to establish rent-

controlled status. Neither party has adequately briefed the elements or procedure for establishing

rent control. Third and most important, the Trustee points out that Defendants have failed to put

forth any evidence regarding age, payment history, or any other fact establishing rent-controlled

status in a form other than a self-serving affidavit containing hearsay and conjecture from

Otway. This is insufficient to create a disputed issue of material fact considering the Trustee's

evidence. *Stull v. N. Shore-Lij CareConnect Ins. Agency, Inc.*, No. 16-CV-2682, 2018 WL

3350319, at *6 (E.D.N.Y. July 9, 2018) ("Uncorroborated sources, hearsay and other

inadmissible evidence may not be relied on to defeat summary judgment.").

### b. Otway Lease

Otway also claims that he also personally had a lease that was rent controlled.

Specifically, Otway claims that he had a lease from the owners (his parents) since 1970, until

ownership transferred to the Debtor. (MSJ Opposition, at 3–4 (citing Otway MSJ Decl.).) When

ownership transferred to the Debtor, Otway argues his lease continued with Debtor as a

successor lessor. (*Id.*) Otway claims that the written lease was on a "yellow pad" that was likely

discarded by a tenant at some undetermined point in time. (*Id.*)

As an initial matter, all the reasoning with respect to the rent-controlled status of the

Scheib's Lease and 80 Theatre Sublease leases applies to Otway's lease with equal force.

Moreover, the Trustee argues, there is insufficient evidence to show that the lease exists, let

alone is rent-controlled. Again, the existence of the lease wholly depends on the self-serving

affidavit of Otway, and he submits no documentation in support. Furthermore, Trustee points

out that if the written lease is in anyone's possession, it would be Otway, given his role as both

the lessee and former controlling party of the lessor.  The Defendants offer no countervailing factual proof as to the lease's existence.

*  *  *

In sum, the Trustee puts forth overwhelming evidence that the Property was not subject to any rent-controlled leases, and the Defendants' evidence regarding retroactive, speculative, eligibility for rent-control does not actually create a dispute of material fact.  Moreover, even if Defendants could establish the existence of rent-controlled leases, they would be estopped from asserting their existence to invalidate the effect of the Forbearance Agreement and Consent Order here.

### B.  Motion to Dismiss

The MTD originally sought dismissal of all three counterclaims filed by the Defendants.  But there is currently only one remaining counterclaim.  Since the MTD was filed, the Defendants withdrew their third counterclaim.  (ECF Doc. # 22.)  Moreover, the remaining two counterclaims appear to be duplicative (MTD, at 13 n. 4), which the Defendants appear to concede.  (*See* MTD Opposition, at 12–13.)  Thus, the only remaining counterclaim is for "tortious interference with prospective advantage."  (*Id.*)

The Trustee argues that this counterclaim should be dismissed for three reasons: (1) Defendants fail to state a claim under Federal Rule 12(b)(6); (2) the Trustee is immune from suit for the alleged conduct; and (3) Defendants asserted the counterclaims against the wrong party, warranting dismissal under Federal Rule 13.

The Court **GRANTS** the motion to dismiss for failure to state a claim, and independently, because the Trustee is immune from suit for the alleged conduct.  The Court notes that while

dismissal is proper on the foregoing grounds, the Trustee generally finds less support in the third

"wrong party" argument, and the opposing brief does little to sharpen the potential issues.

      1.  <u>Failure to State a Claim</u>

To state a claim for tortious interference with business relations, a (counterclaim)

plaintiff must adequately allege that: "(1) the plaintiff had business relations with a third party;

(2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful

purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the

relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir.

2008).

The Trustee has two main arguments why Defendants fail to state a claim for tortious

interference with business relations: (a) Defendants fail to allege a "wrongful purpose" under the

third element; and (b) Defendants fail to allege that the Trustee interfered with the third party in

question under the second element.  Additionally, the Trustee also argues that the Defendants

have not made out a claim for the related, but distinct, tort of interference with contract.

      *a.  Wrongful Purpose/Means.*

First, the Trustee argues that Defendants fail to properly allege the third element of their

tortious interference claim—that "the defendant acted for a wrongful purpose or used dishonest,

unfair, or improper means." *Id.*  Indeed, the wrongful purpose/means element requires the

plaintiff to allege criminal or independently tortious conduct, or that the defendant acted solely

out of malice.  *See Carvel Corp. v. Noonan*, 3 N.Y. 3d 182, 192 (N.Y. 2004); *Kirch v. Liberty

Media Corp.*, 449 F. 3d 388, 400 (2d Cir. 2006).  When, in contrast, "a defendant has acted with

a permissible purpose, such as normal economic self-interest," wrongful means cannot be shown,

"even if the defendant was indifferent to the plaintiff's fate." *16 Casa Duse, LLC v. Merkin*, 791

F.3d 247, 262 (2d Cir. 2015) (citations and internal quotation marks omitted).  Comparatively,

proving a tortious interference with business relations claim is "more demanding" than proving a

tortious interference with contract claim because of the "wrongful purpose" requirement.

*Catskill Dev.*, 547 F.3d at 132.

> Defendants' claims regarding the Trustee's interference boil down to three allegations:

> (1) During the bankruptcy, the Defendants were presented with an opportunity to make money by allowing a Production Company to conduct a film shoot at the Property;
> (2) When Defendants consulted the Trustee about the opportunity, the Trustee raised a series of concerns regarding the proposed agreement for the shoot to the Debtor and Defendants, and denied their authority to execute the agreement; and
> (3) The Trustee failed to respond or provide authorization quickly enough when the Defendants allegedly ameliorated the issues causing Trustee's concern.

("Otway MTD Decl.," *In re 78-80 St. Marks*, ECF Doc. # 112 at 5–9.)  These allegations

insufficiently plead the wrongful purpose/means element for a tortious interference with business

relations claim.

> First, Defendants emphatically contend that Trustee's "delay" was what caused their

alleged injury because the Trustee only provided a response one day before the production shoot

was supposed to start.  That response, however, came barely one week after the Trustee first

raised issues with the agreement governing the production shoot.  (*See* "Holecek MTD Aff.,"

Exs. A and C, ECF Doc. # 17-2.)  Defendants have cited no cases—and the Court is unaware of

any—where passive delay in assenting to a plaintiff's conduct with a third-party has constituted

wrongful means, let alone where the "delay" in question was approximately one week.  This

"delay" was also apparently in the context of the third-party's production schedule over which

the Trustee had no control; the fact that the Trustee's final response ended up being the day

before filming was to start does not make the Trustee's conduct wrongful.

Moreover, the Defendants' gripe is not really with delay at all.  The Trustee effectively

repeated its position from its June 30 correspondence in its July 7 correspondence—the

Defendants had no ability to independently authorize the production, and the Trustee would not

authorize it due to the risks of liabilities it posed to the estate.  At bottom, Defendants' real

complaint is that the Trustee did not share their view that the benefits of the shoot outweighed

the drawbacks, and that the Trustee did not authorize the shoot to occur as a result.  Defendants

also miss an important point here, as they fail to engage with the Trustee's assertion that Theatre

80 had no independent authority to grant permission to shoot: (1) on behalf of the Debtor-owner,

who was under control of the Trustee; or (2) as a lessee, given that Defendants recognized that

any leases were invalid/terminated as part of the Consent Order.

Defendants unsurprisingly fail to point to any caselaw that would explain why this rises

to the level of a wrongful means.  Defendants only tie their allegations to caselaw by arguing that

"some degrees of economic pressure" can constitute a wrongful means, *see Guard-Life Corp. v.

Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 190 (1980), and that the Trustee exerted such

pressure on the production company.  But again, any "pressure" felt by the production

company—namely, to secure an agreement to use another party's property to conduct a film

shoot in less than a few weeks to meet its own desired schedule—was completely self-imposed.

If this can even be considered "pressure," it arose quite literally through no action of the Trustee.

If anything, the Trustee expressed doubts regarding the agreement from the beginning of the

correspondence, removing any doubt that there was a reasonable expectation to use the Property

by Defendants or the production company.  Overall, Defendants cite no caselaw for the

proposition that a party's withholding of consent to use property—which the party has a legal

right (or obligation) to maintain—constitutes a sufficient allegation of "wrongful means," even

where the withholding of consent forgoes a substantial benefit to another party with a shared

interest in the property.

Defendants fail to adequately plead the third element of the tortious interference with

business relations claim as a result.

b. *Trustee Interference with Third Party.*

The Trustee also argues that Defendants fail to allege a tortious interference with

business relations claim because Defendants fail to allege that the Trustee interfered *with the*

*third party* in question. The New York Court of Appeals has held that "conduct constituting

tortious interference with business relations is, by definition, conduct directed *not at the plaintiff*

*itself*, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp.*,

3 N.Y. 3d at 192 (emphasis added).

As discussed above, the Defendants fail to adequately allege that the Trustee's conduct

constituted an "improper means" of harming the Defendants. Even more problematic for

Defendants is the fact that only a fraction of that conduct was even directed at the third-party, as

is required under cases like *Carvel*. The allegations in the MTD Opposition largely allege that

the communications regarding the possible use of space were conducted directly between the

Trustee and the Defendants. There is a single allegation in the counterclaims of any direct

conduct between the Trustee and the third party; it appears that after Trustee raised concerns to

Defendants, Defendants relayed those to the third party, and counsel for the third party allegedly

contacted the Trustee about resolving those concerns and received no response. (*See* Answer ¶¶

128–49.) This further narrows the scope of actionable conduct in Defendants' already

insufficient allegations.

> *c. No Tortious Interference with Contract.*

Finally, the Trustee also argues that the Defendants fail to state a claim for tortious

interference *with contract* as opposed to *with business relations*.  Recall that there are differences

between the two, and that the latter is "more demanding" to allege and prove.  *Catskill Dev.*, 547

F.3d at 132.  Presumably, the Trustee does this to preempt any argument that the Defendants are

also proceeding under an interference with contract theory, given Defendants' allegations that

"[t]he Production Company came to an agreement on the dates, terms and usage of the

theater."  (*See* Answer ¶ 130.)

The Trustee is correct that the Defendants do not adequately allege tortious interference

with contract.  First, Defendants do not actually allege the existence of a contract, which is an

element of the claim.  *See Plasticware, LLC v. Flint Hills Resources, LP*, 852 F. Supp. 2d 398,

404 (S.D.N.Y. 2012) (dismissing claim for insufficient specificity as to the formation of the

contract between parties at issue).  While Defendants claim that they were in "agreement on the

dates, terms and usage of the theater" (Answer ¶ 130), this "agreement" stops short of alleging

the legal formation of a contract.  Indeed, the thrust of the allegations are that Defendants were

prevented from entering into a contract with the Production Company due to the Trustee's

concerns and withholding of authorization.

Furthermore, this point is underscored by the fact that the Defendants' counterclaims do

not contain any allegations with respect to how any alleged contracts were breached, which is

also an element of an interference with contract claim.  *See Berman v. Sugo LLC*, 580 F. Supp.

32

2d 191, 208 (S.D.N.Y. 2008) (dismissing claim that failed to allege how the third party breached a contract).[8]

    2. Immunity

The Trustee's second basis for dismissal raises the issue whether the Trustee is immune from suit for the challenged actions in question.

Generally, the Trustee notes that public officials, judges, and court officials are absolutely immune from common law tort liability for actions within the scope of their official duties. *Stump v. Sparkman*, 435 U.S. 349, (1978) (concluding that judge immune from defamation suit); *Barr v. Matteo*, 360 U.S. 564 (1959) (concluding that acting director of federal office of rent stabilization immune from defamation suit). Absolute immunity bars a suit at the outset, *Gray v. Bell*, 712 F.2d 490, 496 (D.C. Cir. 1983), even excusing allegations that the official acted maliciously or without authority. *Stump*, 435 U.S. at 355–56.

The Trustee correctly observes that bankruptcy trustees acting as officers of the court to conserve the bankrupt estate's assets can claim immunity from suit for certain acts. *See Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981); *Smallwood v. United States*, 358 F. Supp. 398 (E.D.Mo.), *aff'd*, 486 F.2d 1407 (8th Cir. 1973). "[A] bankruptcy trustee is a quasi-judicial official 'immune from suit for personal liability for acts taken as a matter of business judgment in acting in accordance with statutory or other duty or pursuant to court order.'" *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 282, 290 (Bankr. S.D.N.Y. 2010) (citing *In re Smith*, 400 B.R. 370, 377 (Bankr. E.D.N.Y. 2009)).

---

[8]     The Trustee also raises that she was acting to protect a valid economic interest. While this could ultimately serve as a defense to validly stated claims, the defense is factual in nature and not indisputably established from the face of Defendants' counterclaims, and it is premature to address in the context of a Rule 12(b)(6) motion. *See Foster v. Churchill*, 87 N.Y.2d 744, 750-51 (1996).

The conduct challenged is the Trustee's decision to withhold authorization for the film shoot to occur at the Property. Trustee's decision was based on the perceived risks to the estate weighed against the lack of any remuneration to the Debtor from the shoot. This exercise of judgment is within the scope of the Trustee's statutorily authorized duties. *See In re Marioneaux*, No. 21-10421, 2022 Bankr. LEXIS 178, at \*20 (Bankr. W.D. La. Jan. 24, 2022) ("An appointed chapter 11 trustee will have 'the statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors.'"). Thus, this is within the scope of immunity afforded to trustees as described by courts in this district. *See Picard*, 440 B.R. at 290–91.

The Defendants raise what can be considered two distinct legal arguments that a trustee may be held liable where: (a) she acts intentionally or negligently; or (b) beyond the scope of her authority.

### a. Intentional/Negligent Acts

The Defendants properly state the proposition that intentionally wrongful or negligent acts can provide an exception from immunity. *See Picard*, 440 B.R. at 291. Of course, the Bankruptcy Code does not allow a Trustee to act negligently or commit intentional wrongs, so this is just a different way of framing the proposition stated above that trustees have immunity when they act within the scope of discretion in executing their duties authorized by the Code.

The Defendants fail to explain how the Trustee acted negligently or intentionally. Defendants articulate that the Trustee's decision was "completely arbitrary" because the Defendants and production company had ameliorated the Trustee's concerns, and that Defendant Theatre 80 would have received $40,000 in compensation "which of course would go to the building," presumably meaning the estate. (MTD Opposition, at 12.)

34

Initially, it is far from clear that any compensation to the Defendants from the shoot would have gone to the estate, given the history of the Defendants wrongful occupation of the Property without paying rent in this case. In any event, the Trustee's weighing of the benefits and risks to the estate in determining whether to allow activities to occur on the Property were solidly within her range of discretion, and beyond Defendants' disagreement, they make no other concrete allegations as to why the decision was negligent or intentionally wrongful.

### b. Ultra Vires

Defendants make a related but distinct argument that the Trustee can be sued for its actions because they were taken *ultra vires*. *See In re Solar Fin'l Servs., Inc.*, 255 B.R. 801, 805 (S.D. Fla. 2000) (stating that a "trustee loses his immunity if he acts in the 'clear absence of all jurisdiction'") (quoting *Grant v. Florida Power Corporation (In re American Fabricators, Inc.)*, 186 B.R. 526 (Bankr.M.D.Fla.1995)).

Defendants' theory is that Theatre 80 is a separate entity from the Debtor, and thus the Trustee had no authority to direct what contracts Theatre 80 could enter into with third parties. Generally, they are correct. Defendants miss the point, however, that Theatre 80 was seeking to conduct activities on the Property that was owned by Debtor (and thus controlled by Trustee) in which the Defendants had no valid interest at the time. A trustee refusing to allow parties with no interest in estate property from using estate property is not *ultra vires*.

Finally, both of Defendants' immunity exceptions under the caselaw recognize that such suits are properly brought against the Trustee personally, as opposed to in the Trustee's representative capacity. *See Picard*, 440 B.R. at 291 (recognizing that negligence or intentional wrong may render trustee personally liable); *Solar Fin'l Servs.*, 255 B.R. at 805 (holding that a "trustee may be sued in his individual capacity for acts which exceed the scope of his

authority"). Even if the Court were to entertain one of these exceptions, this would in turn

warrant dismissal under the Rule 13 analysis, as discussed *infra*.

      3.  <u>Rule 13/Wrong Party</u>

Finally, the Trustee argues that the counterclaims against her should be dismissed

because the counterclaims are not properly brought against her in her capacity as the opposing

party.

Federal Rule 13, made applicable by Bankruptcy Rule 7013, directs that counterclaims be

asserted "against an opposing party." *See* FED. R. CIV. P. 13(a), (b); FED. R. BANKR. P. 7013.

"The generally prevailing, although not uniform, view is that the 'opposing party' requirement

means that when a plaintiff has brought suit in one capacity, the defendant may not counterclaim

against him in another capacity." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d

875, 885–886 (2d Cir. 1981) (citations omitted).

The Trustee's theory is that she brought suit as the Chapter 7 Trustee, but that Defendants

are suing her in her (former) capacity as the Chapter 11 Trustee. While the Defendants do not

directly challenge application of this theory, the Court does not endorse it.

For one, the Trustee cites no caselaw in support of such a precise application of the rule,

i.e., to find that a trustee transforms into an entirely different party for the purposes of Rule 13

simply because a case is converted to a different chapter under the Bankruptcy Code. The

caselaw cited by the Trustee deals with much more significant legal distinctions between the

representative and individual capacities of the entity involved in the suit. *See Banco Nacional de

Cuba*, 658 F.2d at 885–886 (determining that bank had brought counterclaims in its individual

capacity, and not its capacity as a trustee). Furthermore, applying the opposing party rule here

would not seem to serve the "principal goal" of Rule 13, which is "is to permit the resolution of

all controversies between the parties in a single suit." *Id.* Defendants touch upon this in their

MTD Opposition, although they characterize it as an exception to the opposing party rule.[9]

As prefaced above, however, if the Court were to credit the Defendants' exceptions to

immunity, which all make the distinction that suit is brought against the trustee personally in

those instances, then the "opposing party" requirement of Rule 13 would not be met by

Defendants here. *See Banco Nacional de Cuba*, 658 F.2d at 885–886.

In sum, the Trustee does not provide a sound independent legal basis for dismissing the

claims pursuant to application of the opposing party rule under Rule 13. The Trustee does,

however, have independent bases for dismissal under Rule 12(b)(6) and its immunity argument,

and for those reasons, the Court **GRANTS** the Motion to Dismiss.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** the Trustee's Motion for Summary

Judgment and **GRANTS** the Trustee's Motion to Dismiss.

**IT IS SO ORDERED.**

Dated: February 6, 2023
New York, New York

_Martin Glenn_
_____
MARTIN GLENN
Chief United States Bankruptcy Judge

---

[9]       Given the lack of caselaw supporting the proposition that the Trustee's capacity is different under chapter 7 and 11, the better view is that the opposing party rule simply does not apply here, rather than finding it applies, but is subject to an exception. The same reasoning should apply to Defendants' other purported exception to the opposing party rule, which is that "if a plaintiff has sued in a representative capacity but will benefit individually from any recovery, a counterclaim may be made against the plaintiff in his individual capacity." *See Blanchard v. Katz*, 117 F.R.D. 527, 529 (S.D.N.Y.1987).

37